884 So.2d 990 (2004)
WEINSTEIN DESIGN GROUP, INC., a Florida corporation, and Robert S. Weinstein, individually, Appellants,
v.
Cecil FIELDER, Appellee.
No. 4D03-3750.
District Court of Appeal of Florida, Fourth District.
September 29, 2004.
Rehearing Denied November 16, 2004.
*993 Gaunt, Pratt, Radford & Methe, P.A., West Palm Beach, and Elizabeth K. Russo of Russo Appellate Firm, P.A., Miami, for appellants.
Daniel S. Rosenbaum and John R. Sheppard, Jr., of Becker & Poliakoff, P.A., West Palm Beach, for appellee.
POLEN, J.
This appeal arises from a final money judgment in a jury trial in favor of Appellee, Cecil Fielder, awarding Fielder compensatory damages of $300,000 and punitive damages of $15,000 for using Fielder's name for commercial and/or advertising purposes without his permission. We affirm in part and reverse in part.
Appellant Weinstein Design entered into a contract with Stacey Fielder (wife of former professional baseball player Cecil Fielder) on November 6, 1996 to provide interior decorating services for the Fielders' home. At some time in 1998, the Fielders stopped paying Weinstein's invoices, leading to a lawsuit that eventually concluded by arbitration. In August of 1999, while the arbitration dispute was pending, Fielder brought the instant suit against Weinstein and the Weinstein Design Group (collectively Weinstein) seeking injunctive relief and damages based on Weinstein's use of Fielder's name for commercial purposes without his authorization, in violation of section 540.08, Florida Statutes, and for the common law tort of name misappropriation.
Pre-trial, Weinstein stipulated to the entry of a permanent injunction, prohibiting Weinstein from future use of Fielder's name and he admitted to using Fielder's name without his consent in violation of section 540.08, Florida Statutes, and to committing common law name appropriation. *994 Therefore, the main issues of fact for trial were (1) whether the article printed in Florida Design magazine about Robert Weinstein was an exception to liability under section 540.08(3); (2) whether Weinstein was liable under section 540.08 for a set of allegedly undistributed brochures; (3) the amount of compensatory damages, if any; and (4) the amount of punitive damages, if any.

1. Weinstein's challenges for cause
During jury selection, Weinstein challenged prospective jurors Porcelli, Dagostino, Rendelman, and Kearns for cause, claiming they were predisposed to favor Fielder. The trial judge denied the challenges as to all four, explaining that he believed that the prospective jurors' allegedly biased answers during voir dire merely reflected that they "felt a tinge of injustice" because they were previously read the pretrial stipulation, in which Weinstein admitted to using the name without permission. The trial judge did, however, grant the challenge as to Kearns for other reasons.
The trial judge then turned to peremptory challenges, first allowing three per side. Weinstein used his three peremptory challenges to strike the three jurors who he failed to convince the judge to excuse for cause. Weinstein then renewed his challenges for cause as to those three jurors and requested additional challenges. The trial judge eventually gave each side two more challenges but denied Weinstein's request for a third additional challenge, for which Weinstein stated he wished to strike prospective juror Lizardi. Lizardi was then seated on the jury. Weinstein again in renewed his motion for an additional challenge to strike Lizardi, which the trial judge denied. The trial judge then read the jury panel's names into the record, whereupon Weinstein stated that he did not accept the panel. Weinstein appeals the trial judge's denials of his challenges for cause and refusals to grant sufficient additional peremptory charges.
The first issue Weinstein raises on appeal is that the trial court abused its discretion by denying his challenges for cause as to prospective jurors. We agree, and therefore we reverse the trial court's denial of Weinstein's challenges for cause and remand the case with directions that the judgment entered below be vacated and a new trial conducted.
Generally, because a trial court has a unique vantage point to determine juror bias, its determination of whether a challenge for cause is proper is a mixed question of law and fact that will not be overturned on appeal in the absence of manifest error. Smith v. State, 699 So.2d 629, 635-36 (Fla.1997). The Florida Supreme Court set forth the standard for determining juror bias in Smith:
The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court. A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind.
699 So.2d at 635 (citations omitted). "Close cases should be resolved in favor of excusing the juror rather than leaving a doubt as to his or her impartiality." Bryant v. State, 765 So.2d 68, 71 (Fla. 4th DCA 2000).
Fielder argues that none of the jurors at issue should have been removed for cause because the trial judge read a stipulation to the jurors, in which Weinstein admitted liability for using Fielder's name without his permission. Fielder argues that the jurors merely expressed a sense of inequity *995 based on Weinstein's admitted liability. In Rolling v. State, 695 So.2d 278, 285 (Fla.1997), the Florida Supreme Court held that a juror is not required to be completely devoid of knowledge of the acts or be devoid of preconceived notions:
To hold that the mere existence of any preconceived notion as to the guilt of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Thus, if prospective jurors can assure the court during voir dire that they are impartial despite their extrinsic knowledge, they are qualified to serve on the jury, and a change of venue is not necessary. Although such assurances are not dispositive, they support the presumption of a jury's impartiality.
Fielder also argues that because the challenged jurors did not claim to have a pre-judged dollar amount they would award Fielder and would need to hear testimony and evidence to establish an amount, there were no grounds to challenge them for cause.
We find Fielder's argument unpersuasive as to the bias of the three challenged prospective jurors who expressly admitted their predisposition toward Fielder (Rendelman, Dagostino, and Porcelli) and hold that they should have been excluded for cause. These three jurors manifestly raised reasonable doubts as to their capacity to be impartial, in that each expressed a predisposition for Fielder, and an inability to be certain that the predisposition could be set aside. "A juror is not impartial when one side must overcome a preconceived opinion in order to prevail." Carratelli v. State, 832 So.2d 850, 854 (Fla. 4th DCA 2003). During voir dire, these three panel members confirmed that they could not set aside "the edge" they would give to Fielder. Each of their final answers to Weinstein's counsel's line of questioning on that issue appears below:
[Counsel]: There's some doubt in your mind as to whether you could be fair to both sides starting out even, correct?
[Prospective Juror Rendelman]: I would like to think that I could put it aside and just look at it on an even scale, but it is something that I would be, it would be in my mind, yes.
[Counsel]: Is there some reasonable doubt in your mind about that?
[Prospective Juror Rendelman]: Yes
[Counsel]: Ms. Dagostino, how do you feel about that, are we starting out even or 
[Prospective Juror Dagostino]: I said that there would be an edge and that you would have to catch up to them, but they would go in with the edge.
[Counsel]: Mr., Porcelli, going back to you, edge versus even Steven, is one side starting out ahead of the other in your mind here?
[Prospective Juror Porcelli]: According to what I have heard so far, yeah. I believe the Plaintiff does have a little bit of an edge because of the fact it seems someone has admitted he used his name without his permission.
In Imbimbo v. State, 555 So.2d 954, 955 (Fla. 4th DCA 1990), this court reversed a denial of a challenge for cause, after a juror admitted during voir dire that she "probably" would be prejudiced but "probably" could follow the judge's instructions. Similarly, in Jaffe v. Applebaum, 830 So.2d 136 (Fla. 4th DCA 2002), this court held that it was error not to grant a challenge for cause as to a prospective juror who admitted that plaintiff would be starting out with "a half strike" against her.
*996 Here, the three jurors all had difficulties similar to those described above. Furthermore, no further questioning rehabilitated them in any way. This case is similar to Franco v. State, in which a "juror never stated that she could follow the law after expressing her problems with the burden of proof and presumption of innocence. There was no attempt to rehabilitate the juror. Even if she had, it would not have necessarily made her acceptable." 777 So.2d 1138, 1139 (Fla. 4th DCA 2001). Moreover, "[w]here, as in this case, a juror expresses views on [an issue of bias], and there is no subsequent change in those views, the trial court's superior vantage point and discretion are of little consequence." Id.
Finally, we note that any alleged error in failing to dismiss a juror for cause may be cured by granting additional peremptory challenges. Curtis v. State, 767 So.2d 627, 628 (Fla. 3d DCA 2000). However, "it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause since it has the effect of abridging the right to exercise peremptory challenges." Street v. State, 592 So.2d 369, 370 (Fla. 4th DCA 1992). Therefore, "[i]f, because of an erroneous denial of a challenge for cause, a party is forced to exhaust his or her peremptory challenges and, subsequently makes a request for additional peremptory challenges which is denied ... an appellate court will reverse and grant a new trial." Imbimbo, 555 So.2d at 955.
In the present case, when the trial court denied these challenges for cause, Weinstein had to exhaust his peremptory challenges to remove the three from the panel. The trial court thereafter granted Weinstein two additional peremptory challenges, but denied his third requested peremptory, which was necessary to compensate for the three peremptories Weinstein used to dismiss jurors that should have been dismissed for cause. Consequently, Weinstein was unable to use a peremptory to remove juror Lizardi, as he sought to do, and the case was consequently tried to a jury that Weinstein did not accept.
Because (1) the three challenged jurors expressly admitted their predisposition toward Fielder; (2) the jurors were not rehabilitated after making statements that confirmed such bias; and (3) Weinstein, in effect, had to waste a peremptory challenge to dismiss a juror who should have been dismissed for cause, we reverse the trial court's denial of Weinstein's challenges for cause and remand the case with directions that the judgment entered below be vacated and a new trial conducted.

2. Weinstein's motions for judgment as a matter of law on the Florida Design magazine article and allegedly undistributed brochures
Because the other issues on appeal are likely to recur upon a new trial, we address them as well. The parties dispute which of the four printed materials containing Fielder's name give rise to Weinstein's admitted liability for unauthorized use of Fielder's name. The parties agree that Weinstein is liable for (1) The Florida Design Source Book (hereinafter Sourcebook)  a trade magazine consisting solely of advertisements ("advertorials") and (2) the company's one-time newsletter to existing clients. However, the parties disagree over whether Weinstein is also liable for (3) the FloridaDesign magazine article and (4) the allegedly undistributed brochures of copies of the Florida Design article.
Weinstein's second argument is that the trial court erred by denying Weinstein's motions for summary judgment and directed verdict as to the Florida Design magazine article and the brochures, thus allowing *997 the jury to consider these in their deliberations. We disagree and affirm.
The standard of review of summary judgment orders is de novo. See The Florida Bar v. Rapoport, 845 So.2d 874, 877 (Fla.2003). "When reviewing a ruling on summary judgment, an appellate court must examine the record and any supporting affidavits in the light most favorable to the non-moving party." City of Lauderhill v. Rhames, 864 So.2d 432, 434 n. 1 (Fla. 4th DCA 2003). Similarly, when reviewing a trial court's denial of a motion for directed verdict, an appellate court must view the evidence and all inferences in a light most favorable to the non-movant, and should reverse if no proper view of the evidence could sustain a verdict in favor of the non-movant. Anesthesiology Critical Care & Pain Management Consultants, P.A. v. Kretzer, 802 So.2d 346, 351 (Fla. 4th DCA 2001).

2.A. The two-issue rule
As a preliminary matter, Fielder argues that the "two-issue rule" precludes consideration of the trial court's denial of a directed verdict as to the Florida Design article and the brochures. The two-issue rule was adopted by the Florida Supreme Court in Colonial Stores, Inc. v. Scarbrough, 355 So.2d 1181, 1186 (Fla.1977). As this court explained in Zimmer, Inc. v. Birnbaum, 758 So.2d 714, 715 (Fla. 4th DCA 2000), the two-issue rule provides: "where there is no proper objection to the use of a general verdict, reversal is improper where no error is found as to one of two issues submitted to the jury on the basis that the appellant is unable to establish that he has been prejudiced."
The two-issue rule is inapplicable here because the rule applies  in the case of a losing defendant  only to actions brought on two theories of liability, as to which just a single basis for damages applies, not to claims in which separate damages are recoverable. The Florida Supreme Court's holding in First Interstate Development Corp. v. Ablanedo, 511 So.2d 536, 538 (Fla.1987), supports this distinction: "the two-issue rule does not apply when two distinct claims for liability result in separate claims for damages in the same action."

2.B. Florida Design magazine
Weinstein argues that the article published in the Florida Design magazine constitutes, as a matter of law, an exception to section 540.08, Florida Statutes, and therefore should not have been submitted to the jury for consideration. Section 540.08, entitled "Unauthorized publication of name or likeness," provides, in pertinent part: "No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use." The statute does not apply to:
The publication, printing, display, or use of the name or likeness of any person in any newspaper, magazine, book, news broadcast or telecast, or other news medium or publication as part of any bona fide news report or presentation having a current and legitimate public interest and where such name or likeness is not used for advertising purposes;
§ 540.08(3)(a), Fla. Stat.
This court has given an expansive interpretation to this exception. In Loft v. Fuller, 408 So.2d 619, 622-23 (Fla. 4th DCA 1981), this court stated:
In our view, Section 540.08, by prohibiting the use of one's name or likeness for trade, commercial or advertising purposes, is designed to prevent the *998 unauthorized use of a name to directly promote the product or service of the publisher. Thus, the publication is harmful not simply because it is included in a publication that is sold for a profit, but rather because of the way it associates the individual's name or his personality with something else. Such is not the case here. While we agree that at least one of the purposes of the author and publisher in releasing the publication in question was to make money through sales of copies of the book and that such a publication is commercial in that sense, this in no way distinguishes this book from almost all other books, magazines or newspapers and simply does not amount to the kind of commercial exploitation prohibited by the statute.... We simply do not believe that the term "commercial," as employed in Section 540.08, was meant to be construed to bar the use of people's names in such a sweeping fashion. We also believe that acceptance of appellants' view of the statute would result in a substantial confrontation between this statute and the first amendment to the United States Constitution guaranteeing freedom of the press and of speech.
In the present case, Weinstein argues that the Florida Design article should not have been considered by the jury because, as the magazine's associate editor Galbo testified, the article was of current legitimate public interest, and was an editorial which the magazine paid a reporter to write for the magazine  as opposed to an advertisement paid for by Weinstein. Galbo stated, "Florida Design is a quarterly publication and when they do an editorial, it's a story written through a designer about a home that we would feature." Galbo also testified that this article was an editorial about Robert Weinstein's own home, which was of interest "from the magazine's point of view, [because] the layout of the home was special ... so the home is of interest."
Weinstein asserts that the editor of a magazine is best situated to determine what items are of current legitimate interest to the members of the public who are likely purchasers of the magazine  or the magazine will not attract purchasers. He argues that Galbo's testimony was unrebutted and was the only record evidence on this issue, which he claims should have compelled the trial court to hold that the magazine falls within the statutory exception to section 540.08 because (1) the article was of current legitimate interest; (2) the magazine published the article as an editorial; and (3) it was not an advertisement paid for by Weinstein.
On the other hand, Fielder argues that whether the Florida Magazine article is exempt under section 540.08(3) was properly a factual issue for the jury. Fielder argues that multiple instances of undisputed testimony at trial could have allowed the jury to conclude that the Florida Design magazine article was being used for advertising purposes: (1) Maxine Adler, Weinstein's publicist, testified that it was her intention to get Weinstein profiled in as many articles in as many different publications as possible, to generate business for Weinstein; (2) Weinstein sought publication of the article, submitted the photographs used in the article, and was given a copy of the article pre-publication for approval; and (3) use of Fielder's name in the article came about exclusively through information supplied by Weinstein, not from any independent research by the article's author. Fielder contends, therefore, that a fair inference to be drawn from the Florida Design article is that the article was published to advertise Weinstein and his services. Additionally, the fact that Weinstein paid about five thousand dollars *999 to produce one thousand brochures of the article for distributing to prospective clients does indicate that the article itself may have had some advertising value.
While it is a close call, we hold that the standard for reversal under Anesthesiology Critical Care, 802 So.2d at 351, is not met here. In deciding whether section 540.08 is applicable to the Florida Design article, we examine the evidence in the light most favorable to Fielder, the non-moving party. Even considering this court's expansive application of the exception in section 540.08(3), we cannot say that the record would support the holding that "no proper view of the evidence could sustain a verdict in favor of the non-movant." Id. Therefore, based on the evidence presented at trial, we affirm the trial court's denials of Weinstein's motions for summary judgment and directed verdict as to the Florida Design magazine article.

2.C. The brochures
Weinstein also argues that the allegedly undistributed brochures should not have been submitted to the jury for consideration. It is undisputed that the brochures constitute advertisement. Weinstein argues, however, that the brochures provide no legal basis for liability because the record shows that Weinstein (1) brought the box of brochures to the court room; (2) testified that he had hand-counted them (as could Fielder if he wished); (3) testified that he had 982 out of 1000; (4) testified that he had given the remaining 18 to attorneys in both this litigation and in the arbitration matter and that his staff had taken some; (5) testified that he did not disseminate the brochures; and (6) testified that he was not aware of any brochures that were ever published to the public.
On the other hand, Fielder contends that the brochures nevertheless provide liability under section 540.08 because the language of the statute provides that "No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose...." § 540.08, Fla. Stat. (emphasis added). It is undisputed that Weinstein did print the brochures for advertising purposes. Therefore, we hold that, while Weinstein's evidence that the brochures were never distributed is relevant to the jury's determination of damages resulting from printing the brochures, the trial court correctly denied Weinstein's summary judgment and directed verdict motions as to the brochures, allowing the jury to consider them in determining any damage award.

3. Punitive damage claim
The parties disagree as to whether the trial judge correctly allowed a punitive damages claim to be submitted to the jury. During trial, Weinstein admitted to (1) using Fielder's name for advertising purposes for approximately two years; (2) knowing he needed Fielder's consent prior to using his name in advertisements; and (3) not receiving Cecil Fielder's consent to use his name for commercial purposes.
The parties also disagree as to whether Stacy Fielder had given Weinstein oral permission.[1] While Weinstein testified that she gave him oral permission, Stacey Fielder testified that she never gave him such permission. Weinstein also testified that he believed Stacey Fielder had the authority to give him permission to use *1000 Cecil Fielder's name and that he did not know that the statute required written authorization[2] for a third party to give permission on behalf of the person whose name is to be used. Finally, it is undisputed that, when Weinstein learned of Fielder's objections, he never used Fielder's name again.
Weinstein argues that the trial court erred by denying his motion for directed verdict on the punitive damages claim, thus submitting the punitive damages claim to the jury. We agree.
Section 540.08(2), Florida Statutes, provides, in part,
In the event the consent required in subsection (1) is not obtained, the person whose ... photograph, or other likeness is so used ... may bring an action to enjoin such unauthorized publication, printing, display or other public use, and to recover damages for any loss or injury sustained by reason thereof, including an amount which would have been a reasonable royalty, and punitive or exemplary damages.
(Emphasis added.) However, the statute does not clarify for the court the standard for determining when instructions regarding punitive damages are appropriate. This court recently summarized the principles governing appellate review regarding whether evidence was sufficient to permit submission of a punitive damage claim to the jury in Air Ambulance Professionals, Inc. v. Thin Air, 809 So.2d 28 (Fla. 4th DCA 2002):
We therefore reiterate our observations in White urging restraint upon the courts in ensuring that the defendant's behavior represents more than even gross negligence prior to allowing the imposition of punitive damages, in order to ensure that the damages serve their proper function. While we remain hesitant to have trial courts routinely remove the question from the jury's consideration, we note that a directed verdict may properly be granted unless the evidence establishes that the behavior in question involves the following type of misconduct:
The character of negligence necessary to sustain an award of punitive damages must be of a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them."
Id. at 31. Applying this standard in Air Ambulance Professionals, this court reversed the trial court's denial of a directed verdict on a punitive damages claim because there was no evidence "of an illicit scheme to put [plaintiff] out of business. Likewise, there was no evidence of fraud or malice ..., of any other type of behavior which would justify punitive damages." Id. at 31.
In Genesis Publications, Inc. v. Goss, 437 So.2d 169 (Fla. 3rd DCA 1983), an invasion of privacy action arising from the publication by a magazine publisher of a nude photograph of the plaintiff in an advertisement without her permission, the *1001 court held that punitive damages were inappropriate. Id. at 171. The defendant argued at trial that it had relied on advertising agencies to obtain the necessary permission for use of the photographs, pursuant to industry practice. Finding insufficient evidence to support punitive damages, the court reversed the trial court's decision to allow the jury to consider punitive damages. Id. at 170. The court held that the record evidence was sufficient to sustain a finding of intentional conduct by publisher, but not a wanton disregard of plaintiff's rights. Id. "The terms `recklessness, wantonness and willfulness,' when used to justify punitive damages implies a knowledge and present consciousness not simply that a statute or right will be violated but that injury will result." Id. at 170-71.
On the other hand, in Sun International Bahamas, Ltd. v. Wagner, 758 So.2d 1190 (Fla. 3d DCA 2000), the court found that, because the defendant knew that its contract to use the plaintiff's likeness in advertisements had expired and did so anyway, punitive damages were appropriate. Id. at 1191-92. The court distinguished Genesis Publications "because there is substantial evidence in the record that, unlike the defendant in Genesis, [defendant] had direct knowledge ... that it had no permission to use [plaintiff]'s photographs."
In the present case, there is no evidence of intentional, malicious misconduct, undertaken with knowledge that injury to Fielder would result. In fact, Weinstein testified that he believed that he had permission from Stacey Fielder and that the association of Fielder's home with Weinstein's firm would benefit Fielder  "[i]t's very prestigious."
We do not find the Sun International holding to be persuasive in this case. This court has made it clear that punitive damages are reserved for particular types of behavior which go beyond mere intentional acts. See, e.g., Air Ambulance Professionals, 809 So.2d at 30. ("Record evidence may support an intentional tort, but not necessarily an award of punitive damages.") Furthermore, "[p]unitive damages are in a sense explicitly based on juror emotion, in that one function of the award is to express society's collective outrage at unacceptable behavior .... punish and deter." Id. at 30-31. We hold that, even when viewing the record evidence in the light most favorable to Fielder, the non-movant, the evidence is insufficient to meet the high standards set forth above that this court has applied in "limiting punitive damages to truly culpable behavior." Id. at 30. Therefore, we reverse the denial of a directed verdict on the punitive damages claim and remand with instructions to vacate the punitive damages award and to grant Weinstein's motion for directed verdict as to punitive damages.

4. Compensatory damages claim
Finally, Weinstein argues on appeal that the trial court's refusal to deny his motions for remittitur and a new trial based on the jury verdict of $300,000 in compensatory damages for the statutory claim were error because such award was excessive. We disagree and affirm.
Fielder's damage expert, Cliff Courtney, testified at trial: "Based on my experience dealing with celebrities, baseball players, and the world of advertising endorsements, I would guess at least a million dollars for this type of usage." He later stated, "I think based on my experience, my opinion is at least a million dollars. I think that's in the deposition, five hundred thousand to a million." Courtney explained that the two main considerations in his valuation were "first of all, what is *1002 Cecil's name worth and only Cecil can decide that ultimately and no one else deserves the right to decide that" and "also what potentially could he have lost in terms of potential for future endorsements." Courtney also testified that he believed Fielder is a unique commodity.
On the other hand, Weinstein argues that Courtney's testimony is unsupported because evidence from Fielder's testimony and tax returns showed that the most Fielder had ever been paid was $250,000 for a Reebok contract of over five years. Fielder's tax returns show that uses of his name for endorsements actually yielded an average of $7500 per endorsement.
Annette Galbo, the corporate representative of Florida Design, testified regarding the Source Book and Florida Design magazine. She stated that the Source Book is published twice a year, although she was unaware of its circulation figures. Galbo testified that Florida Design magazine has an approximate circulation of 200,000 per issue and is read in 57 countries. She also testified that readers keep Florida Design magazine for some time after publication, and she believed the same was true of the Source Book.
On the other hand, Weinstein's expert Daniel Muggio testified that the value to Weinstein of using Fielder's name was "maybe five to ten thousand dollars." He testified that Fielder's past endorsement contracts were mostly for five to ten thousand dollars.
Muggio testified that the Florida Design magazine is circulated predominately in Florida and is only published in English. He also testified that the magazine "is skew[ed] towards more female head of houses" and that "[f]rom being involved in aspects of marketing, I would say men would be more likely to know a baseball figure."
Orders on motions for remittitur are reviewed for abuse of discretion. See, e.g., Hernandez v. Gisonni, 657 So.2d 33 (Fla. 4th DCA 1995). Remittitur cannot be granted unless the amount of damages is so excessive that it shocks the judicial conscience and indicates that the jury has been influenced by passion or prejudice. See Bartholf v. Baker, 71 So.2d 480, 484 (Fla.1954):
We have repeatedly held that we will not reverse a case for a new trial on the ground that the verdict is excessive, unless it appears upon a consideration of all the testimony that the verdict was so much greater than it should have been as to shock the judicial conscience. We have also held that the burden is upon the appellant to establish the fact that the verdict is wholly unsupported by the evidence or was the result of passion, prejudice or other improper motive.
Section 540.08(2) provides that "damages for any loss or injury sustained by reason thereof, including an amount which would have been a reasonable royalty, and punitive or exemplary damages."
At trial, each side put on damage experts, whose testimonies created a significant disparity in the royalty value of Fielder's name for Weinstein's uses, as discussed above. Weinstein argues that Courtney's testimony estimating a wide-ranging "five hundred thousand to a million" is incompetent as evidence of damages. However, Weinstein did not seek at trial to strike Courtney's testimony as speculative. Weinstein asserts that the jury's verdict should have corresponded with evidence provided by Fielder's tax returns that his average endorsement contract was about $7,500 and that the most Fielder had ever been paid for the use of his name was $250,000 for a five-year Reebok contract.
As this court held in Gordon v. Smith, 615 So.2d 843, 844 (Fla. 4th DCA 1993):
It is axiomatic that a finder of fact may judge the persuasiveness and credibility *1003 of an expert's testimony and apply his own knowledge and experience when weighing opinion evidence. When that expert has been hired and called to testify by one of the adversaries to a contested proceeding, there is nothing unreasonable or improper with the fact finder declining to accept the testimony of such an expert.
In the present case, the jury heard testimony from the experts not only on the value of Fielder's name but, significantly, in context of Weinstein's present argument about the unsupported nature of Courtney's testimony, the jurors also heard testimony on the considerations which went into the experts' valuations. The jury, when presented with expert testimony with competing opinions on the amount of damages, was free to accept or reject all or part of the testimony as it saw fit. See id. The jury returned a verdict of damages between the ranges proposed by the two experts, and actually closer to the testimony of Weinstein's expert than Fielder's expert. However, since we have ordered a new trial the issue of remittitur is moot.
Accordingly, for these reasons we reverse the denial of Weinstein's challenges for cause and remand for new trial, affirm the denial of Weinstein's motions for summary judgment and directed verdict on the Florida Design magazine article and allegedly undistributed brochures, reverse the punitive damage award, and the denial of remittitur for the compensatory damage award is moot.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL.
MAY, J., and GOLD, MARC H., Associate Judge, concur.
NOTES
[1] Although the question of whether Stacey Fielder gave Weinstein oral permission to use Cecil Fielder's name is irrelevant to liability under section 540.08, Florida Statutes (which would require permission by Cecil Fielder), it is arguably relevant to the contested issue on appeal of whether the issue of punitive damages should have gone to the jury.
[2] The statute allows either oral or written permission from the person whose name is used, but in a case where a third party gives consent on behalf of the person whose name is to be used, the statute requires a written authorization from the person whose name is used to the consenting third party. § 540.08(1)(b), Fla. Stat.